NANCY E. OLIVER, Appellant, v. MARY A. JOHNSON et al.

Division Two, December 19, 1911.

1. **SPECIFIC PERFORMANCE: Of Oral Contract: Necessary Conditions.** In order that there may be specific performance of an oral contract to grant or devise land, three things must be proved: The contract, performance by the suitor, and that the refusal to grant specific performance would be equivalent to giving judicial sanction to a fraud. The contract must be proved as pleaded, and its terms, both as pleaded and proved, must be certain, clear, definite and unambiguous. The things alleged to have been done in performance must be necessarily

referable to the contract set up.  Moreover, if the contract be unfair or its consideration inadequate, or if there be a remedy at law, or if it is not clear that for the court to refuse specific performance is to lend itself to the perpetration of a fraud, there will be no decree for performance.  Further, that ·performance may be decreed, the case must be made out by evidence of such character that no reasonable doubt can be entertained of its truth, or of the existence of the contract or the certainty of its terms, or that the plaintiff has wholly performed.

2. ————: ————: Evidence Insufficient.  The evidence in this suit for specific performance of an oral contract to grant or devise lands is reviewed and the finding of the chancellor below is upheld, denying specific performance.

3. ————: ————: ————: Testamentary Disposition.  Evidence indicative of no more than a testamentary disposition can afford no basis for a finding that a contract to devise lands existed.

4. ————: ————: Witness: One Party Dead.  A plaintiff who sues for specific performance of an oral contract to grant or devise lands made with an owner now dead (plaintiff's parent), is not competent to testify in chief.

5. ————: ————: ————: ————: Husband of Living Party. Nor is the·husband of such party a competent witness in chief.

Appeal from Knox Circuit Court.—*Hon. Charles D. Stewart*, Judge.

AFFIRMED.

*O. D. Jones* and *J. C. Dorian* for appellant.

(1)  This action is against the heirs and executor of the deceased to specifically enforce an agreement to make a will of real estate to a daughter in consideration of her living with and making a home for and taking care of her father.  In such a case, "the will is not set aside,·but the devisee, heir or executor, is made trustee to perform the contract."  Wright v. Tinsel, 30 Mo..389.  Such a contract though oral is valid, and the plea of the Statute of Frauds will not avail if there has been part performance.  Gupton v. Gupton, 47 Mo. 46; Sutton v. Hayden, 62 Mo. 112; Sharkey v.

McDermott, 91 Mo. 655; Headley v. Simpson, 113 Mo. 346; Steel v. Steel, 161 Mo. 574.   (2) Is the agreement proved?   (a) In the year 1897 O. D. Jones wrote a will for deceased.   Deceased did not want to put it in a bank, but asked it be put in an envelope to take home with him.   In the light of all the evidence it will be conclusively presumed that he took it home to show the plaintiff.   His wife had then just died and he was alone, all but the plaintiff and her husband and family.   (b) He declared to these nine different persons at different times under different circumstances, for a space of eight years prior to his death, that he intended· for Ella to have the home when he was done with it.   To three of them, Mrs. Bowman, Mr. Harris and Mr. Platts, he declared he had agreed with Ella to do it if she would remain with and take care of him; and to Platts and Sam Taylor he had so made his will.   (c) He made five or six wills from 1897 to 1907, and until about seventeen days before his death they all provided she should have the land in fee or for life.   All this testimony and these facts are absolutely undisputed.   (3) Plaintiff was offered at the close of her case in chief and held incompetent by the court, on the objection that she is plaintiff and the person with whom she made the agreement and under whom she claims is dead.   As to any part of the agreement with him, we concede she was not competent.   But as to the defense of estoppel, it was no contract or transaction in issue to which the deceased was a party.   It was based on transactions since his decease, with Epperson as the other party.   Epperson was permitted to testify fully as to statements of plaintiff and her husband, before the will was admitted to probate, December 2, 1907, as after.   And as to that, plaintiff was competent to testify.   The fact that she was "the party in interest" was no ground to exclude her or her husband.   It was error to allow Epperson to state what her husband said, without showing it was in her presence,

Oliver v. Johnson.

or that he was her agent, of which there was no at-
tempt. It was asserted by counsel he was a "party in
interest." He had a right to testify to the whole
case. Toovey v. Baxter, 59 Mo. App. 470; Steffen v.
Bauer, 70 Mo. App. 404.

*L. F. Cottey, F. H. McCullough* and *C. R. Fowler*
for respondents.

In a suit to specifically perform an oral agreement
for an interest in real estate, the proof of the contract
must be so cogent, clear and forcible as to leave no
doubt in the mind of the chancellor as to its terms and
character. There must be no doubt in the petition as
to the statement of the case or in the contract. There
must be like proof that the acts done unmistakably
refer to and result from that contract. The proof must
show not only that some contract was made, but that
the contract counted on in the bill was made. There
must be no equivocation or uncertainty in the case. It
must be in terms a contract and not a mere declara-
tion of intention or expectation. In fine, there must
be a contract definitely and conclusively proven. Cas-
ual and loose conversations, when not supported by
other evidence, are entitled to little, if any, weight.
This is dangerous testimony: is looked upon with jeal-
ousy, and should be weighed in the most scrupulous
manner. Agreements of this kind are looked upon
with suspicion and ought not to be encouraged. These
agreements are within the Statutes of Frauds and are
sustained only where it would work a fraud if one
party was allowed to plead it. Charpiot v. Sigerson,
25 Mo. 63; Sitton v. Shipp, 65 Mo. 297; Rogers v.
Wolfe, 104 Mo. 1; Teats v. Flanders, 118 Mo. 660;
Steele v. Steele, 161 Mo. 566; Kinney v. Murray, 170
Mo. 701; McElvain v. McElvain, 171 Mo. 244; Goodin
v. Goodin, 172 Mo. 48; Asbury v. Hicklin, 181 Mo.
676; Grantham v. Gossett, 182 Mo. 651; Rosenwald v.

Middlebrook, 188 Mo. 89; Russell v. Sharp, 192 Mo. 286; Kirk v. Middlebrook, 201 Mo. 289; Wales v. Holden, 209 Mo. 576; Collins v. Harrell, 219 Mo. 309; McQuinn v. Moore, 225 Mo. 36; Forrister v. Sullivan, 231 Mo. 373; Foley v. Harrison, 136 S. W. 393.

BLAIR, C.—On November 8, 1907, Cornelius M. Coe died at his home in Knox county, Missouri. By his will, executed October 17, 1907, he gave to his daughter, Nancy E. Oliver, the appellant herein, all his personal property, absolutely, subject to the payment of his debts, and also devised to her the use of his real estate for one year after his decease; the will further providing that after the expiration of appellant's tenure under it, the real estate should be sold and the proceeds divided among the heirs, of whom appellant was one, share and share alike. John M. Epperson was named as executor of the will, and after Coe's death met with the defendants, Mary A. Johnson and Medley S. Coe and appellant and her husband, and read the will to them. On this occasion, appellant, after asking if the executor "could do that business under the will without probating it," and being advised that the executor "had no authority to carry out the will without probating it," told Epperson to "go ahead and probate the will." This Epperson did, the inventory and appraisement following in the usual manner.

The personalty was left in appellant's possession with the understanding that out of it the debts, if any, and costs of administration were to be paid by her.

Appellant and her husband then negotiated for the purchase from the executor of the land in suit and indicated they would give $3125 for it. The executor told them he would see the other heirs and if that price was satisfactory he would sell it for that amount. Medley S. Coe, one of the respondents, offered $3600 for the property, and after informing appellant

of this offer, the executor, on February 28, 1908, entered into a contract of sale with Medley S. Coe, on which the latter paid $100, the balance payable March 1, 1909. After this contract of sale was entered into and appellant was apprised thereof, she brought this suit. Thereupon Epperson, the executor, demanded a receipt for the personalty he had delivered to her, and she signed and delivered to him the following receipt, prepared by her attorney:

"Edina, Mo., May 19, 1908.

"Received of J. M. Epperson, executor of the last will and testament of C. M. Coe, the following described personal property as described in the appraisement caused by him to be made in said estate, to-wit: One-half interest in 19 shoats, etc. [Then followed a list of items, the appraised values totaling $878.30.]

"And in case debts are proven against said estate and no personal assets on hand out of which to pay same, I agree to refund all or so much of the proceeds of said property as may be necessary to pay said debts and the costs of the administration of said personal and not real estate, under the will of said C. M. Coe.

"NANCY OLIVER."

The suit was returnable to the June, 1908, term of the Knox county circuit court, and was brought to enforce specific performance of a contract alleged to have been made with appellant by Cornelius M. Coe, deceased, whereby he in 1897 agreed to give to her the land in suit if she and her husband and family would reside with him and care for him until his death. Answers consisting of general denials and pleas of estoppel were filed by respondents and a jury was impaneled which heard the evidence, disagreed and was discharged. The court continued the case until the 30th day of July, 1908, at which time appellant filed an amended petition, the answers and replies were refiled

and the court rendered a general judgment for respondents, dismissing the bill.

In the amended petition appellant sets forth the contract, of which she seeks specific performance, as follows:

"Now comes plaintiff and asks leave to file this, her first amended petition in the cause to conform it to the proofs and evidence in the cause and states, she is the daughter of Cornelius M. Coe, who departed this life in Knox county, Missouri, on the 8th day of November, A. D. 1907. That on or about the 6th day of July, A. D. 1897, while she was married to her present husband, N. S. Oliver, she was residing then in the home of her father near the town of Locust Hill, Knox county, Missouri, with her husband and family.

"That plaintiff's mother, the wife of said deceased, had then only shortly since departed this life and he was alone, only that plaintiff and her family were with him in his home. That plaintiff's mother, in her lifetime, informed her of the arrangement hereinafter stated, intended to be made by the said deceased.

"That on the 6th day of July, A. D. 1897, plaintiff's father went to the city of Edina and had prepared and written and executed his will. That on the next Sunday morning after his return home with it, he took it out of the drawer and handed it to this plaintiff, saying, "Here, Ella, this is yours, keep and take care of it." He then told her that it was his will and that the following lands described in it were devised by him to her, to be hers after he was done with it or at his decease, in fee simple if she and her family would continue to live with him in his home, as they had done and were then doing and take care of him in his declining days, he being then about the age of seventy-six years. And that in addition thereto she should have all of his personal property and effects left after the payment of his debts. That to this plain-

tiff assented and agreed and took and put away the said will and had the care and custody of it for a long time.

"That plaintiff informed her husband and family of the agreement and arrangement and they all assented to it and immediately entered upon the labor and duty of fulfilling their side of the said agreement. That said lands so described in said will and referred to as those devised to plaintiff, were and are described as follows:

"Twenty-seven acres off the entire west end of the north half of the northwest quarter of section 6, and the northeast fourth of the southeast quarter of section 1, except six acres off of the entire south side thereof. Also ten acres, the south half of the north half of the northwest quarter of the northeast quarter of section 1, all in township 60, and in range 13, west, except the above described twenty-seven acres which is in range 12, west, in all, seventy-one acres."

The amended petition then avers that the testator was induced by the other heirs to change his will and that appellant was informed by others of changes therein, but the matter was not mentioned by her father. Performance of the agreement is pleaded and certain improvements are alleged to have been made. In the first count of the amended petition the prayer is that the fee simple title to the property be vested in appellant, and in the second count, that she be vested with a life estate.

Since the question in this case is as to the sufficiency of the evidence, it is necessary to state briefly the testimony of the witnesses.

B. H. Fugate testified that Mr. Coe had said nothing to him "about any contract he had with his daughter about living with her," but had frequently spoken to him about what he intended to do for her. Witness didn't know of any agreement between the father and

daughter, and understood from what Mr. Coe said that he meant he was going to do something for appellant in the future.

Dr. Humphrey, a physician, testified that Mr. Coe told him, about three years before the trial, that the land in suit was not for sale; that after he "was through with it, he intended for Ella [appellant] to have it."

Harry Tonkinson testified that Mr. Coe on one occasion, in talking of his affairs, and what he had given some of his grandchildren, had said to him, speaking of the land in suit: "This place I expect for Ella to have."

Walter Huling testified that Mr. Coe, about May, 1907, had said to him: "I want to stay here as long as I live and when I get through with the home I want it to be Ella's. I have fixed it so it will be Ella's."

J. A. Ren testified that in the fall of 1903 he was employed by appellant's husband to build a barn on the place and that Oliver asked Mr. Coe where he should put the barn. Mr. Coe said "it did not make any difference to him where, that it would be his (Oliver's) and Ella's when he was through with it."

Cora Bowling testified that about 1905 she heard Mr. Coe say, concerning the land in suit: "I intend for Ella to have that for her home when I am gone." On another occasion she heard him say, in substance, that it would be a pretty place "when Ella gets it fixed up."

Allie Coe, a daughter of one of the defendants, was called as a witness for plaintiffs and testified that she had never heard anything about her grandfather intending or agreeing to give the property to her Aunt Ella, the appellant.

Martha Bowman's deposition was offered and her testimony was, that, about 1905 or 1906, Mr. Coe, in discussing an offer of respondent Mary A. Johnson and her husband to buy the land in suit, said he asked

them what would become of him, and the husband replied that he could live with them; that he could buy Ella a few acres somewhere else and he (Coe) told them: "No, no, that was Ella's home: Pop (Mrs. Johnson) was married and left home before we moved there. And I gave Mr. Johnson thirty acres, deeded it to him to take the children to Kirksville, that was their portion;" that he repeatedly said it was Ella's home if she staid and took care of him; "that when he died Ella was to have what he had, and the personal property was to pay his expenses, what it took, what it needed, and the rest was hers—the rest had theirs. She never had anything until she got this."

"Q. What did he say, using his language as nearly as you can, as to an arrangement and agreement between himself and his daughter Ella as to where his home was during his life?

"A. Why it was to be there with her. She was to take care of him, and she done it mighty faithfully. He said she was to have all he had after his expenses were paid, and the personal property would pay that. And what was left she would have."

On cross-examination the witness testified: "From what he said at that time he wanted to own the place as long as he lived, then when he got through with it and the expenses were paid it was Ella's. That was what he said he intended to do with it."

David Harris, a brother of Mattie Bowman, testified with respect to the same conversation which she attempted to relate. He said that conversation occurred in the spring of 1906, and that Mr. Coe said that when Mrs. Johnson wanted to buy the place he asked her what would become of him, and she told him he could live with them and "then he wanted to know what Ella would do, and they said: 'You could buy her a few acres and let her have that,' and he said, 'No, this was Ella's home, it never was Pop's home; she married and left before we moved there. Ella was

born and raised there and when I am through with it, it is Ella's.'"

Witness said: "He set his cane down on the floor and said: 'This place is Ella's when I am through with it; the contract calls for it, when she stays there and takes care of me while I live. There will be enough personal property to pay my expenses, and the place is to be Ella's; the rest have had their part.'"

He further testified that he heard the conversation to which Ren testified as to locating the barn, that Mr. Coe was called out and asked as to the place to put the barn; that he indicated a spot which appellant's husband said was too flat, and asked, "Why not put it here by the road where the ground is rolling?" Mr. Coe replied: "Just put it any place you want to, for when I am through with it it will be Ella's—put it where you think will be the best place for it."

On cross-examination witness said that Mr. Coe told him the contract was made before the Olivers moved into the house with him; that they moved there not less than fourteen years before the trial.

"Q. What was it he said there? A. He said the contract was that if she stayed there his lifetime she was to have the place and his expenses were to be paid out of the personal property.

"Q. When did he say they made that contract? A. When they went there.

"Q. Did he tell you that? A. Yes, sir; right there in the house.

"Q. When was it they went there? A. They were there right at fourteen years, not less than that.

"Q. Was the contract made before they went there or after they went? A. They went there under that contract.

"Q. Did he say that? A. Yes, sir; he said that was the contract when they went there.

238 Sup.—24

"Q. How long before they went there? A. He didn't say whether it was fifteen or twenty minutes.

"Q. Where did they come from there? A. Macon City, as near as my estimate of it, there's where they lived at one time.

"Q. Did he say this contract was made in Macon county? A. No, sir; didn't say whether it was made in Macon City or Shelby county.

"Q. What did he say this contract called for? A. Called for *them* to have the place and the personal property was to pay his expenses and she was to have the balance after he was through with it, the rest of them had theirs.

"Q. What did he say the others had had? A. Well, sir; it would take me six months to tell you."

"Q. Go on and tell it. A. That's out of my line of business. He said the others had had their shares. That was not all he said—he said they had their shares. He said they had gouged him enough and Ella had had nothing and she was to have the home place, if she staid there and took care of him."

Witness further states that Mr. Coe did not say in the conversation about the barn that the property was to belong to both appellant and her husband after his death.

A. R. Platts testified that in talking with him about the offer of respondents Medley Coe and Robert Johnson, husband of respondent Mary A. Johnson, to pay part of the funeral expenses of Gerald Coe if he would deed them both a strip off the land in suit, Mr. Coe said: "I put my foot down on that; I said this is Ella's, I agreed if she staid here with me as long as I lived, that this should be hers. I have my will made and Ella is to have the home place." This conversation occurred about 1903.

No witness attempted to testify to having heard any contract made between Mr. Coe and his daughter, the appellant, nor to having heard any contract men-

tioned in her presence or that of her husband. The children of appellant, two boys, about fourteen and nineteen years of age, respectively, at the time of the trial, did not testify in the case.

Appellant and her family moved to the Coe homestead about 1892 or 1893 (not later than 1894), and the contract is alleged to have been made on July 6, 1897. There is no evidence outside of the testimony (supra) of Harris as to what the arrangement was under which appellant and her family went to her father's home to live and under which they lived until July, 1897.

The evidence as to the improvements is that a summer kitchen and a barn were built on the premises, and that an old orchard was cleared out and a new one planted, and that several acres of brush land were cleared and put in cultivation.

It was admitted that the trees for the new orchard were bought by Mr. Coe and set out prior to July 6, 1897. There was also credible evidence that the summer kitchen was built in 1895 or 1896. The barn was a small post barn, the evidence indicating that it was "sided up with old lumber." It does not appear who paid for the material. Appellant's husband did part of the work and paid off the men who assisted him, but with whose money the witnesses were unable to say.

The orchard which was cleared off was one which had died after the Olivers moved to the farm, and witness Harris intimates it covered about two acres. The brush ground which was cleared was variously estimated at from five up to ten acres in area. About two-thirds of it was covered with hazel brush, and the clearing was done about 1902, and the ground subsequently cultivated.

Appellant and her family lived with Mr. Coe until his death, but there is no evidence that he needed any particular attention until his last illness, which lasted

but a few days, and during which Mrs. Johnson as-
sisted in caring for him. He was mentally and phy-
sically strong and inclined to have a will of his own,
and was recognized as a leading citizen in his com-
munity up to the time of his death.

He was much interested in raising poultry and the
only evidence as to the manner in which the family
expenses were paid was the testimony of one of the
merchants from whom supplies were bought, to the
effect that goods were bought and eggs brought in in
payment, appellant's husband paying whatever bal-
ance there was at the end of the year. Mr. Coe paid
his own bills for medical attendance, except for his
last sickness, and that bill had not been paid at the
time of the trial. During the life of Mr. Coe he re-
ceived an income from the farm either in the way of
rent or otherwise. There was evidence that he and
appellant's husband were in partnership.

In July, 1897, appellant's present attorney drew
a will for Mr. Coe, to which fact he testified, but did
not testify as to the contents thereof. The evidence
does not disclose what disposition this will made of
the property. Subsequent wills, made from time to
time, provided that appellant should have a life estate
in the land in suit. In 1904, a new will was executed,
giving appellant the personalty only, and providing
for the sale of the realty and the distribution of the
proceeds among the heirs at the testator's death. This
will was unchanged until the execution of that men-
tioned in the petition.

I. There was no pretense that there was a writ-
ten contract.

The rules of law applicable in cases of this kind
have been often and clearly laid down by this court.
Three things must be proved: The contract, perform-
ance by the suitor, and that the refusal to grant spe-
cific performance would be equivalent to giving judi-
cial sanction to a fraud.

The very contract pleaded, and none other, must be proved, and its terms as both pleaded and proved, must be certain, clear, definite and unambiguous.

The things alleged to have been done in performance must be necessarily referable to the contract set up. They must, in fact, be consistent with the contract pleaded and proved, and inconsistent with any other reasonable theory than that they were done pursuant to such contract.

In addition, though the contract and its performance be never so well proved, if the contract is unfair, its consideration inadequate, if there be a remedy at law, or if it is not clear that for the court to refuse specific performance is to lend itself to the perpetration of a fraud, the performance of a contract in a case of this kind will not be decreed.

Further, the case must be made out "not by vague or shadowy evidence, not even by a mere preponderance, but by evidence so unquestionable in its character, so clear, cogent and convincing, that no reasonable doubt can be entertained of its truth; that no such doubt can linger either as to the existence of the contract or the certainty of its terms or that the plaintiff has wholly performed his part." [Russell v. Sharp, 192 Mo. l. c. 285, 286, and cases cited; Forrister v. Sullivan, 231 Mo. l. c. 373, 374, and cases cited; Goodin v. Goodin, 172 Mo. l. c. 48, and cases cited.]

From end to end, through pleadings and proof, "there must be an absence of doubt or equivocation throughout the whole case." [Forrister v. Sullivan, supra.]

II.   In considering the evidence in this case, in the light of the rules of law applicable to it, it must be kept in mind that some deference is to be paid to the findings of the chancellor below, who heard the witnesses and who was not convinced by their testimony. Another fact of some importance is that the jury which

was impaneled was unable to reach an agreement on the evidence now before this court. While neither the one nor the other, nor both, of these things, as a matter of law, preclude a reversal on the evidence by this court, both are significant as indicating the impression made by the witnesses upon both the trained legal mind of the chancellor and the minds of laymen summoned to assist him in resolving the questions of fact which now confront us on the cold record.

The testimony of Fugate, Tonkinson, Huling, Ren, Dr. Humphrey, Cora Bowling, and Allie Coe, is indicative of no more than a testamentary disposition and, of course, affords no basis for a finding that a contract existed, much less for a finding as to its terms. [Forrister v. Sullivan, supra.] The testimony of Mattie Bowman is of no greater value. Leading questions as to the existence of "an arrangement and agreement between Mr. Coe and his daughter Ella as to where his home was to be during his life," elicited no more than a conclusion of the witness, the value of which, if any, was practically destroyed by the cross-examination.

The principal witness for appellant was David Harris. He had once had some trouble with the respondent, Medley Coe, who was to become, by purchase, the owner of the land in suit in case appellant failed to recover in this case. The conversation to which he attempted to testify occurred some two and one-half years before the trial and at a time when Mr. Coe's will, then existing, gave appellant no interest in his realty greater than that of his other heirs. Harris testified to a contract entirely at variance, as to the time it was made, with that pleaded. The petition counts on a contract made in 1897, and Harris testified that Mr. Coe told him that the contract was made prior to the removal of appellant and her family to the farm (1892 or 1893) and that they moved there pursuant to that contract. Further, the variance be-

tween his testimony and that of Mattie Bowman, who testified to the same conversation, is sufficiently material to require explanation, and the testimony of each of these witnesses discloses that Mr. Coe gave as reasons for his intention that appellant should have the farm, and his refusal to sell to Mrs. Johnson, that "the rest had had their part," and that "Ella had been born and raised there," and that it had "never been Pop's (Mrs. Johnson's) home," reasons unnecessary if there was in existence a contract under which Mr. Coe was bound to give the place to his daughter Ella, the appellant.

There is also a discrepancy between the testimony of this witness and the witness Ren with respect to the conversation between Mr. Coe and appellant's husband concerning locating the barn, and his testimony gives indication that possibly his zeal somewhat over-stimulated his memory.

The witness Platts testified that the conversation which he had with Mr. Coe occurred in 1903. At that time, Mr. Coe's will provided that appellant should have a life estate in the land in suit, and in concluding his statement concerning his agreement with his daughter, Mr. Coe said, according to Platts, "I have made my will and Ella is to have the home place." The witness "did not think he was mistaken as to the substance of the language" Mr. Coe used. Mr. Coe's language was: "I agreed if she [appellant] stayed here as long as I lived she should have this for her home." He volunteered the statement. The witness testified to the terms of the contract no further than here set out. He said his memory was hazy with respect to some things to which he attempted to testify.

No effort to prove the contents of the will executed in 1897 was made, though the scrivener was appellant's attorney in this case and testified that he drew the will, nor is there any explanation of such failure. No explanation is given or attempted to be

given as to what became of that will, nor is it shown that it is not still in appellant's possession.

It is inferable from the evidence that appellant's sons lived at home and must have been in constant association with their grandfather, but neither of them was a witness in the case.

No effort was made to show under what agreement appellant and her family first moved to the land in suit, nor upon what terms the place was cultivated until 1897, when the contract pleaded is alleged to have been made, nor does it appear that any change of any kind was made in the division of the profits of the place (or in other respects) after 1897.

It is not shown definitely what property and money appellant and her husband accumulated by reason of such profits, though it seems to have been rather considerable in view of the property omitted from the appraisement. Neither in the trial court nor in this, in pleadings or in proof, is it made clear whether the contract set up entitled appellant to the fee or a life estate. In fact, in this court appellant's counsel is unable to solve this question.

The conduct of appellant with respect to the property after her father's death, her direction to the executor, after inquiring of him whether he could carry out the will without probating it (desiring to avoid costs), to "go ahead and probate it," her effort and that of her husband to buy the place from the executor whose only right to sell was given by the will she here assails, and the complaint that she was not given an opportunity to meet Medley Coe's offer, are all inconsistent with a consciousness that the property was already justly hers.

With respect to the improvements, some were made before the contract is alleged to have been entered into, some were proved to have been made in whole or in part at Mr. Coe's expense, and none were definitely shown to have been made and paid for ex-

clusively by Oliver.  None was made or paid for by appellant.  The character of those made subsequent to 1897, so far as the evidence discloses, was not such as to induce the conviction that they would not have been made in the absence of a contract like that pleaded. [Collins v. Harrell, 219 Mo. l. c. 302.]

Under the law applicable to this case, we cannot say there was no reason for the doubts evidently entertained by the jury and the trial court.  The casual declarations, of which there was evidence, themselves fell far short of excluding doubt.  [Rosenwald v. Middlebrook, 188 Mo. l. c. 94, 95.]

III.  Certain objections to the admission and exclusion of evidence were taken.  There was no error in refusing to permit appellant or her husband to testify in chief.  Each was allowed to testify so far as competent, in rebuttal.  [Forrister v. Sullivan, 231 Mo. l. c. 378.]

Appellant's husband, had he been a party to the contract alleged and a party plaintiff, would have been subject to the provisions of section 6354, Revised Statutes 1909.  Therefore, the suggestion that he was "a party in interest," though not a party of record, and was consequently competent to testify on the whole case, is incorrect.

On the whole record, we are of the opinion that the finding of the chancellor was warranted.  The judgment is affirmed.  *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court.  All the judges concur.